**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-10645**
_____

**JOHN GLENN MOODY,**

**Petitioner-Appellant,**

**versus**

**GARY JOHNSON,**
**TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
**INSTITUTIONAL DIVISION,**

**Respondent-Appellee.**

_____

**Appeal From the United States District Court**
**for the Northern District of Texas**
_____

April 16, 1998

Before DAVIS, JONES, and DUHÉ, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Petitioner John Glenn Moody appeals from the judgment of the district court denying his request for habeas relief. Moody's issues center around claims that he was incompetent to stand trial and that the state's expert witnesses on future dangerousness, Dr. Grigson and Dr. Griffith, testified falsely. We affirm.

## FACTUAL BACKGROUND

Moody was convicted of killing Maureen Maulden, a 77-year-old widow for whom Moody occasionally did yard work. Mrs. Maulden's body was discovered in her home in Abilene, Texas by her sister on July 4, 1988; she was nude with a telephone cord wrapped tightly around her neck. Her dentures were loose and later tests detected the presence of spermatozoa in her mouth, indicating that she had been orally sodomized. Her home had been ransacked, and her purse as well as two rings which she normally wore were missing.

The day after Mrs. Maulden's body was discovered, Moody was arrested by local authorities on an unrelated charge of public intoxication. At the time of his arrest, he had in his possession the two rings missing from Mrs. Maulden. Testimony at Moody's trial indicated that a bloody fingerprint found on Mrs. Maulden's telephone belonged to Moody and that Mrs. Maulden's neighbors had seen a vehicle resembling Moody's wife's car driving slowly through the neighborhood and parked in Mrs. Maulden's driveway on the day of the murder.

On February 28, 1989, a jury convicted Moody of capital murder and sentenced him to death. His conviction and sentence were affirmed by the Texas Court of Criminal Appeals. *See Moody v. State,* 827 S.W.2d 875 (Tex. Crim. App.), *cert. denied,* 506 U.S. 839 (1992). In April of 1993, Moody, while represented by counsel, filed a state application for writ of habeas corpus, in which he

2

raised fourteen claims. The state court denied him relief on September 27, 1993. In December of 1993, Moody again petitioned for state habeas relief, raising six additional claims. He was again denied relief.

On March 3, 1994, Moody filed a petition for writ of habeas corpus below, raising 23 grounds for relief. The magistrate judge conducted a five-day evidentiary hearing on Moody's request for federal habeas relief, after which he recommended denial on all grounds. The district court adopted the recommendation of the magistrate judge and denied Moody's claims. After Moody timely filed a notice of appeal and applied for a certificate of probable cause ("CPC") with the district court, the district court granted both a certificate of appealability ("COA") and CPC.[1]

## DISCUSSION

In an appeal from a request for habeas relief, we review a district court's findings of fact for clear error and issues of law *de novo*. *See Barnard v. Collins,* 958 F.2d 634, 636 (5th Cir. 1992), *cert. denied,* 506 U.S. 1057 (1993).

---

[1]After Moody filed his application for a CPC, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), changed the jurisdictional requirements for obtaining a CPC and now requires an applicant to obtain a COA. *See* 28 U.S.C. 2253(c)(2), as amended ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."). However, because Moody's federal habeas action was initiated on March 3, 1994, before the effective date of AEDPA, the pre-AEDPA habeas standards apply to his appeal. *See Lindh v. Murphy,* 521 U.S. ___, ___, 117 S. Ct. 2056, 2063 (1997). The district court granted a CPC, so the case is before us on direct appeal.

A.  COMPETENCY TO STAND TRIAL

Moody first complains that at his state court trial his right to due process of law was violated because he was tried while incompetent.  "It is well settled that due process prohibits prosecution of a defendant who is not competent to stand trial." *Washington v. Johnson,* 90 F.3d 945, 949-50 (5th Cir. 1996) (citing *Cooper v. Oklahoma,* ___ U.S. ___, ___, 116 S. Ct. 1373, 1377 (1996)), *cert. denied,* ___ U.S. ___, 117 S. Ct. 1259 (1997).

> The constitutional standard for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as a factual understanding of the proceedings against him."

*Carter v. Johnson,* 131 F.3d 452, 459 (5th Cir. 1997)(quoting *Dusky v. United States,* 362 U.S. 402, 402 (1960)); *see Washington,* 90 F.3d at 950.  Before the federal district court has a duty to investigate a habeas petitioner's claim of incompetency, the petitioner must show that there are sufficient facts to "'positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during trial.'"  *Washington*, 90 F.3d at 950 (quoting *Bruce v. Estelle,* 536 F.2d 1051, 1058-59 (5th Cir. 1976)).  Once the petitioner has presented enough probative evidence to raise a substantial doubt as to his competency at the time of trial, he

4

must then prove that incompetency by a preponderance of the evidence. *See id.* (citing *Bruce,* 536 F.2d at 1059).

In Moody's case, whether the magistrate judge determined that Moody had presented enough probative evidence to raise a substantial doubt as to his competency at the time of his trial is unclear. In any event, the court held an evidentiary hearing which lasted for five days. At the conclusion of that hearing, the court ruled, first, that Moody had shown no basis to overcome the presumption of correctness afforded state court findings and, second, that even if he considered the evidence from the evidentiary hearing, Moody did not prove that he was incompetent at the time of his trial.

Moody complains that the court erred in according the presumption of correctness to the state court determination of competence because (a) competency is a mixed question of law and fact that must be reviewed *de novo* by federal habeas courts and (b) the presumption cannot apply where the state courts plainly failed to adjudicate Moody's claim. Additionally, he asserts, the court's alternative denial of relief on the merits was wrong. Each of these arguments is seriously flawed.

No caselaw in the Supreme Court or in this circuit requires a federal habeas court to review *de novo* the state court's determination of competency to stand trial. *See Carter,* 131 F.3d at 460 (habeas petitioner is entitled to federal evidentiary hearing only by offering clear and convincing evidence of a

threshold doubt of competency). In this case, the magistrate judge, barraged with evidence that was not fully and timely presented to the state courts, elected to conduct an evidentiary hearing. He was not inevitably required to do so, however, and he was not bound, after having conducted the hearing, to deny the presumption of correctness. *See id.*

Second, it is bold indeed for Moody to assert that there should be no presumption of correctness because the state court never adjudicated competency. Any lack of adjudication was largely his fault. He raised competency in his second habeas petition, describing in general terms his experience of parental neglect and abuse, his chronic addiction to mind-altering substances, a family history of brain aneurysms, and the conclusions of unspecified mental health experts, then-recently retained, that he suffers from mental illness, paranoid delusions, and brain damage. These experts concluded, according to the generalized allegations of the petition, that Moody was unable rationally to consult with trial counsel.

The state's response to this state petition cited *Bruce v. Estelle, supra*, for the proposition that a petitioner who after the fact claims incompetency to stand trial has a heavy burden of proof and then noted:

> Moody merely states conclusions that he may have had genetically transmitted brain aneurysms and mental illness, that a CAT SCAN in 1984 detected a likely brain aneurysm. He does not present any evidence that he was suffering from brain damage that rendered him incompetent at the time of trial. Mr. Moody points to post-

6

conviction evaluations in asserting that he suffers brain damage and mental illness. Furthermore, Moody does not offer any evidence in the form of affidavits or test results, he merely promises to present some unspecified expert testimony at a hearing to support a showing of actual incompetence at the time of trial. Because Moody has not met his burden, relief should be denied. (citations to Moody's pleadings omitted.)

The state habeas court and Texas Court of Criminal Appeals adopted the state's response and denied relief on the record before them. Although Moody does not admit it, this is a finding that he did not carry his burden of proof of incompetency at trial. A state court's finding against a habeas petitioner is not deprived of the presumption of correctness simply because the petitioner disagrees with the state court's finding.[2]

But even if we accepted Moody's contention that the presumption of correctness does not apply, we would still affirm the district court's denial of relief on the merits. We review a district court's decision regarding the competency of a petitioner to stand trial, when a hearing has been conducted in federal court, as a mixed question of law and fact:

Whether a [p]etitioner suffers from a mental disorder or incapacitating mental illness is a question of fact reviewed under the clearly erroneous standard. However,

---

[2]In view of the state court determination that Moody presented insufficient evidence of incompetency to stand trial, the federal habeas court probably was not required to conduct an evidentiary hearing. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715, 1721 (1992) (petitioner is entitled to a federal evidentiary hearing only if he can show cause for his failure to develop the facts in state court proceedings and actual prejudice resulting from that failure, or to avert a fundamental miscarriage of justice).

7

we take a 'hard look' at the ultimate competency finding.
*Washington,* 90 F.3d at 951 (citations omitted).

A review of the testimony presented at the evidentiary hearing -- including evidence from Moody's own expert witnesses -- indicates that at the time of Moody's trial, he had sufficient present ability to consult with his counsel with a reasonable degree of rational understanding and that Moody had a rational as well as a factual understanding of the proceedings against him. It is unnecessary to analyze all the evidence presented at the federal hearing. Moody relied on various experts who based their opinions of his incompetence on intelligence and personality tests, neuropsychological and neuropharmacological evaluations, reports of lay witness interviews, and neuroradiological tests. Based on these various methods, the experts concluded that because of one or more experiences, such as multiple head injuries and severe substance addiction, Moody suffered brain damage that caused him to be unable to consult properly with his attorney before trial. The state's evidence contradicted these witnesses in various particulars and added powerful direct evidence of Moody's condition between the time of his apprehension for Mrs. Maulden's murder and the prosecution. Moody assisted defense counsel, gave appropriate responses in several transcribed interviews, was interviewed on television, and wrote letters to the jury, to counsel, and to his wife. A psychologist called by the state found no evidence of paranoia or similar problems from a review of Moody's writings and

8

words contemporaneous with the prosecution. Moody's family gave counsel no clue that mental illness might be present. Moody's attorney denied that he ever doubted Moody's competency. The evidence was disputed; the magistrate judge's finding for the state was not erroneous. Moody has failed to prove otherwise by a preponderance of the evidence.

B. EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Moody next complains that he received ineffective assistance of counsel at both the guilt/innocence phase and the punishment phase of his trial because his counsel failed to investigate Moody's mental health. To assert a successful ineffectiveness claim, Moody is required to establish both (1) constitutionally deficient performance by his counsel and (2) actual prejudice as a result of his counsel's ineffectiveness. *See Carter,* 131 F.3d at 463 (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). "Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim." *Id.* In order to satisfy the first prong of the *Strickland* analysis, Moody must prove that his counsel's performance fell below an objective standard of reasonableness. *See id.* Reviewing courts must give counsel's performance high deference. *See id.* The determination whether counsel was constitutionally ineffective is a mixed question of law and fact that this court reviews *de novo. See id.*

This claim of ineffectiveness is undermined by the preceding discussion. Moody's trial counsel could not have been deficient in failing to discover his alleged incompetence where there has been no satisfactory showing that Moody was incompetent. Counsel made a reasonable investigation and, finding no evidence that suggested the mental problems Moody now complains of, reasonably decided not to request a mental evaluation. *Cf. id.* at 464 ("'There can be no deficiency in failing to request a competency hearing where there is no evidence of incompetency.'" (quoting *McCoy v. Lynaugh,* 894 F.2d 954, 964 (5th Cir. 1989)).

C. ALLEGED IMPROPER CONTACT BETWEEN BAILIFF AND JUROR

Moody next complains that his trial was "tainted by an improper and inherently prejudicial contact between a bailiff and a juror during guilt-innocence deliberations" in violation of his constitutional rights. This court reviews alleged improper influence of the jury to determine whether the intrusion affected the jury's deliberations and thereby its verdict, while remaining mindful that the Constitution does not mandate a new trial every time that a juror is placed in a potentially compromising situation. *See United States v. Olano,* 507 U.S. 725, 738-39 (1993) (relying on *Smith v. Phillips,* 455 U.S. 209, 217 (1982)).

The facts underlying this claim were described by the Texas Court of Criminal Appeals as follows:

> [A]fter the jury was retired to deliberate at guilt/innocence there was some conversation between one of the jurors and the court bailiff. The record reflects that after beginning deliberations, the jury submitted

10

> two written questions to the trial court wondering about the meaning of "venue" in the context of the jury charge. . . . After the trial court announced its intention to submit [an] additional instruction, [Moody's] attorneys informed the court that it had come to their attention that it had been related to the jury that there had been a mistake in the jury charge which was going to be corrected and that an individual juror had been asked if they had arrived at a verdict yet, and if not, they would be taken to supper by 7:00 o'clock (sic).

The jury returned it verdict shortly after this conversation before 7:00 p.m. that evening. Moody asserts that the exchange between the bailiff and one of the jurors violated his constitutional rights because it had the effect of hastening the jury's deliberative process.

The determination of whether there was any improper conduct and its affect, if any, on juror impartiality are questions of historical fact that "must be determined, in the first instance, by state courts and deferred to, in the absence of 'convincing evidence' to the contrary, by the federal courts." *Rushen v. Spain,* 464 U.S. 114, 120 (1983) (citing *Marshall v. Lonberger,* 459 U.S. 422, 433 (1983)). After conducting two hearings on this issue, the state trial court determined that any conversation between the bailiff and one of the jurors did not impact the jury's deliberations; the court therefore denied Moody's motion for a new trial. Likewise, when presented with this issue on direct appeal, the Texas Court of Criminal Appeals was unable to discern any injury to Moody caused by this contact between the bailiff and the juror and held that the State had sufficiently discharged its

11

burden of rebutting any presumption that Moody's jury was influenced by such contact. *See Moody,* 827 S.W.2d at 899-900.

There is more than adequate support in the record for the factual conclusions reached by state courts. We defer to these factual determinations and affirm the ruling of the district court that no constitutional error occurred.

### D. DR. GRIGSON'S TESTIMONY

Moody attacks the testimony of Dr. James Grigson, an expert who testified for the prosecution that Moody would be a future danger. Moody asserts that at the time of trial, Dr. Grigson was in possession of a report "that bore heavily on Dr. Grigson's claimed ability to accurately predict 'future dangerousness' in capital cases" and that as a result, Dr. Grigson presented materially false and misleading testimony at Moody's trial. Moody also asserts that the prosecution's failure to disclose the report as impeachment material violated *Brady v. Maryland*, 373 U.S. 83 (1963).

It is well settled that the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected. *See Giglio v. United States,* 405 U.S. 150, 153, (1972) (citing *Napue v. Illinois,* 360 U.S. 264 (1959) and *Mooney v. Holohan,* 294 U.S. 103 (1935)). However, if false evidence is presented by the prosecution at trial, a new trial is warranted only if the false testimony could have, in any reasonable likelihood, affected the jury's determination. *See id.* at 154.

12

Similarly, under *Brady*, the prosecution's failure to disclose information to the defense is a constitutional violation only if the evidence was material to either guilt or punishment.

The district court concluded that there was no showing that either the prosecution or Dr. Grigson presented any false testimony. After a thorough review of the proceedings, we agree. Dr. Grigson's failure to mention every report of which he was aware, when he was never asked to do so, does not constitute false testimony.

We also note that even if Dr. Grigson's testimony might have been misleading, there is not a reasonable likelihood that its correction would have affected the jury's verdict.[3] Prior to Dr. Grigson's testimony at the punishment phase, Moody had been convicted of the brutal rape and strangulation of a 77-year-old woman. Additional evidence presented at the sentencing phase of his trial included the rape of his ten-year-old stepdaughter, a lengthy criminal history, and evidence of repeated escapes from incarceration. In the face of such compelling testimony, it is unlikely that the jury's ultimate determination would have been different.

E. DR. CLAY GRIFFITH

---

[3]For purposes of this discussion we assume *arguendo* that the possession of the "report" on subsequent criminal acts by ten convicts, at some of whose trials Dr. Grigson had testified, was subject to *Brady* although it was possessed not by the Taylor County D.A.'s office, which prosecuted Moody, but by the Dallas County D.A.'s office (which wrote the "report") and by Dr. Grigson.

Moody's final complaint concerns the testimony of prosecution witness Dr. Clay Griffith, a member of the American Psychiatric Association ("APA"), who also testified at the sentencing phase as to Moody's potential for being dangerous in the future. Moody claims that the prosecution permitted Dr. Griffith to testify falsely as to the APA's position on the prediction of future dangerousness in capital cases.

The district court found that Moody did not establish that Dr. Griffith testified falsely and assuming, *arguendo*, that he did testify falsely, the State did not know that the testimony was false when presented. We have thoroughly reviewed the record and again agree with the district court that no false testimony was presented.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court denying habeas relief.

14