Marcus Reymond **ROBINSON**,
Petitioner–Appellant,

v.

Marvin L. **POLK**, Warden, Central Prison, Raleigh, North Carolina, Respondent–Appellee.

Michael William Lenz, Amicus Supporting Appellant.

No. 05–1 (CA–00–127–5–F–HC).

United States Court of Appeals, Fourth Circuit.

April 7, 2006.

Geoffrey Wuensch Hosford, Hosford & Hosford, PC, Wilmington, NC, Kevin Patrick Bradley, Durham, NC, for Petitioner–Appellant.

Roy Cooper, Attorney General, Valerie Blanche Spalding, North Carolina Department of Justice, Raleigh, NC, for Respondent–Appellee.

Jennifer Leigh Givens, Virginia Capital Representation Resource Center, Charlottesville, VA, for Amicus Supporting Appellant.

Judge WILKINSON wrote an opinion concurring in the denial of rehearing en banc.

Judge KING wrote an opinion dissenting from the denial of rehearing en banc.

### ORDER

PER CURIAM.

Appellant filed a petition for rehearing en banc, and appellee filed a response in opposition to the petition.

A member of the Court requested a poll on the petition for rehearing en banc. The poll failed to produce a majority of judges

in active service in favor of rehearing en banc. Judges Michael, Motz, King, and Gregory voted to rehear the case en banc, and Chief Judge Wilkins and Judges Widener, Wilkinson, Niemeyer, Luttig, Williams, Traxler, Shedd, and Duncan voted against rehearing en banc.

The Court denies the petition for rehearing en banc.

WILKINSON, Circuit Judge, concurring in the denial of rehearing en banc:

I vote to deny rehearing en banc. I do so because to reverse this case would require us both to ignore the constraints that AEDPA places on our review of state court proceedings and to create a new rule regarding juror Bible consultation in a capital sentencing deliberation. Whatever our views might be on this difficult issue de novo, we should not apply them retroactively.

This case divided the three-judge panel that heard it, and not surprisingly—the issue of juror reliance upon the Bible during capital sentencing deliberations is not a simple matter. It is a subject that straddles the divide between two fundamental Sixth Amendment concerns: the demand that the jury be free of prejudicial external influences, and the requirement that jurors be drawn from the community as a whole.

The constitutional inquiry into Bible use during capital sentencing must track these opposing interests. The constitutional line is crossed where the Bible ceases to be used for personal sustenance and reflection, and is instead collectively relied upon to decide a capital defendant's fate. This danger is greatest when a Bible is present in the jury room and becomes a focus of the jury's life-or-death deliberations. But where the Bible is present in the jury room as an article of devotion for individual jurors, no constitutional line is crossed,

as the law cannot and should not probe into matters of personal conscience.

I would therefore distinguish between personal and deliberative use of the biblical text. In my judgment, a clear instruction announcing this line should be given when a Bible is in the jury room. Since jurors are presumed to follow such instructions, *see, e.g., Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000), this cautionary step should insulate the vast majority of verdicts and deliberations from any subsequent attack. Where, as here, no instruction was given, an evidentiary hearing might be appropriate when there is reason to believe that the Bible has been used as a deliberative aid. Because, however, the principle that I would follow has not been clearly established in federal law, I cannot fault state courts for failing to adhere to it, and I concur in the order denying rehearing en banc.

## I.

The Sixth Amendment jury-trial right "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). At its core, the right contemplates that jurors will render their decision based on the law and the facts presented. *See Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Courts have always recognized that jurors' personal convictions, including religious ones, may impede the dutiful performance of their momentous responsibility. Jurors in capital cases can, for example, be dismissed for cause on the basis of religious opposition to the death penalty. *See generally Wainwright v. Witt,* 469 U.S. 412, 423–24, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). As this practice acknowledges, certain deeply held religious beliefs may

have particular resonance with the demanding moral issues surrounding capital punishment. And the First Amendment plainly illustrates that religion poses unique concerns within our legal system. The Constitution does not, therefore, allow religious considerations to replace legal ones.

The simple presence of a Bible in the jury room would not broach constitutional norms. The matter is one of degree. There is a difference between a juror bringing a Bible into the jury room for personal strength and support and the jury as a whole reading and debating the biblical text as the basis for a life and death decision. Such a debate is constitutionally problematic. For the Bible is not only a work of enormous literary and historical significance. It is a sacred and authoritative expression of the Judeo–Christian tradition and of the Jewish and Christian faiths. Its very place as a canon of scriptural authority is so powerful that it threatens to supplant the individualized sentencing inquiry into the nature and consequences of the crime and the particular aggravating and mitigating circumstances brought forward in the evidence. It thus bespeaks no disrespect of divinely inspired teaching to say that a jury's capital sentencing determination must rest in the end on the requirements of law. If the presence of a Bible in the jury room drives the collective discussion, and renders a capital sentence the result of religious command, then in my view, an important line has been crossed.

The readily apparent dangers of holding otherwise reinforce the propriety of this rule. Our country is increasingly pluralistic, not only in terms of racial and ethnic diversity, but in religious beliefs as well. This brings real benefits to our communities, but so too does it create the potential for greater religious conflict. Though many of its teachings are universal, the Bible nonetheless remains a sectarian text that serves as the theological foundation for certain religions and not others. If it could be brought into the jury room as a basis for discussion and debate upon the ultimate punishment the state may impose, it would be only a short while before jurors of different faiths brought their own holy texts into the conversation. The jury room is not the place to debate the respective merits of the Bible, the Koran, the Torah, or any other religious scripture that Americans revere, nor is it the proper forum for a clash between belief and non-belief. These discussions would likely be divisive, and might range far afield from the appropriate legal and factual inquiry. In a pluralistic America, the jury room must remain a place of common ground firmly rooted in law, irrespective of deeply and sincerely held religious differences.

A jury's reliance on the Bible during capital sentencing deliberations also has serious implications for the public perception of our criminal justice system. A defendant must never suspect that he was sentenced to death on the basis of religious dictate, especially if the jury's religious beliefs are not his own. Nor should the families and friends of murder victims believe a capital verdict of whatever sort was driven by biblical readings and discussions. Juries have legitimacy in a democracy because, despite the variety of jurors' beliefs, they are united in the common endeavor of legal judgment. Any contrary perception threatens the most basic premise of the rule of law.

## II.

While the Bible must not become a catalyst for transforming juror deliberations into religious debate, its mere presence in the jury room does not contravene constitutional values. "Our system of criminal

justice rests in large measure upon a confidence in conscientious juror deliberations and juror attentiveness." *Stockton v. Virginia,* 852 F.2d 740, 744 (4th Cir.1988). The law therefore forbids parties from disrupting the sanctity and privacy of the jury by conducting post-verdict inquiries into matters internal to jurors or their deliberations. *See, e.g., Tanner v. United States,* 483 U.S. 107, 117–18, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); *Hyde v. United States,* 225 U.S. 347, 383–84, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

A juror's possession of a Bible in the jury room represents just such a matter. As discussed above, collective examination of the Bible during capital sentencing deliberations carries a genuine threat of harm. But quite the opposite is true when the Bible is an object of private, rather than public, contemplation. When present in the jury room, the Bible can serve important purposes for individual jurors that bear no relation to the imposition of divine law or the elevation of religious over legal judgment.

Any other view is unrealistic. "We are a religious people whose institutions presuppose a Supreme Being," *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952), and the Bible has always occupied a solemnizing place in public life. It has, for example, been used since the very birth of our nation in administering the oath of office to public officials. *See Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 26–27, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (Rehnquist, C.J., concurring in the judgment) (describing George Washington swearing upon and kissing the Bible during his first inauguration). A Bible likewise commonly accompanies court-room oaths. *See, e.g.,* N.C. Gen.Stat. § 11–2 (2003) ("Judges and other persons who may be empowered to administer oaths, shall [with certain exceptions] require the party to be sworn to lay his hand upon the Holy Scriptures.").

Just as a trial participant may solemnize his oath with a Bible, a juror may retain a Bible in the jury room to remind him of the importance of the duty he has sworn to perform. This is no more objectionable than the President keeping a Bible in the Oval Office or a judge having one in chambers. In none of these cases would it be appropriate to presume that the Bible is a replacement for, rather than a reminder of, the individual's oath to uphold and apply the law.

Beyond emphasizing the serious nature of jury deliberations, a Bible can also provide a juror with the sustenance of faith at a difficult or even anguished time. For some jurors, daily Bible affirmation, or simply having a Bible nearby, constitutes a crucial aspect of personal identity. And even someone who does not frequently consult the Bible may desire one when faced with the heavy burden of selecting between a lifetime of incarceration or a sentence of death. The law need not deny the implements of faith to people when they need them the most. For those who find refuge in its teachings, the Bible can provide the strength to impose whatever punishment the law compels.

Our legal system would do a disservice to Americans of faith by presupposing that the consolation they find in the Bible would affect their impartiality as jurors. Jury service is not antithetical to religious belief, and jurors need not check the objects of their faith at the court-house door. We would not, for example, require removal of rosary beads or a yarmulke or a nun's habit as an incident of jury service. Such accouterments bespeak devotion, not prejudgment. To ask that jurors become fundamentally different people when they enter the jury room is at odds with the idea that the jury be "drawn from a fair cross

section of the community," *Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Beyond the disservice to individual jurors, denial of Bibles for personal sustenance risks making jury duty less palatable to communities of faith. The Sixth Amendment does not require a rule that would actively discourage a broad section of our population from productive jury service.

### III.

It will fall to trial courts to navigate the tensions in these cases. Those courts need not bar all Bibles from the jury room, but they must endeavor through instructions and voir dire to ensure that their presence does not become a constitutionally problematic influence on jury deliberations. When exercising its discretion to grant a juror's request for a Bible, a trial court should issue a clear instruction that jurors use it only for personal sustenance and devotion, and avoid discussing it or referencing it as a source of authority for decisionmaking. A similar instruction should also be given on request of counsel, or if the court were to otherwise become informed that a juror had a Bible in his possession.

I am aware that court instructions can seem to some jurors to drone on and on, but an instruction on the appropriate and inappropriate usages of religious texts is well within the jury's understanding and likely to command its attention. A specific instruction of this type would help to prevent the dictates of religion from becoming a focal point of collective discussion and go a long way toward protecting the integrity of the jury's ultimate sentencing determination. It would therefore rebut any presumption of prejudice. *See Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The meticulous use of the traditional tools involved in ju-

ror voir dire and instructions should obviate the need for evidentiary inquiries that disrupt the lives of jurors and that seek to fathom the dynamics and interplay that legitimately form part of every jury verdict.

### IV.

The panel majority expressly declined to address the proper resolution of this case if it were before us de novo. There is no suggestion that an instruction of the type I have just described was given here. While under such circumstances I would draw the constitutional line between personal and deliberative use of the Bible, I do not think we as judges have authority under AEDPA to fashion such a rule, much less to accord it retroactive effect.

A state court has already determined that the jury's use of the Bible during these deliberations did not violate the Sixth Amendment, and petitioner now seeks federal habeas relief. The scope of our review is therefore circumscribed by the strictures of 28 U.S.C. § 2254 (2000). We can only overturn the state decision if it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). The state decision is unreasonable if it "applies [the Supreme] Court's precedents to the facts in an objectively unreasonable manner." *Brown v. Payton,* 544 U.S. 133, 125 S.Ct. 1432, 1439, 161 L.Ed.2d 334 (2005).

Applying this deferential standard, there is no fair basis to conclude that the state decision in this case was an unreasonable application of clearly established federal law. The Supreme Court has not had occasion to consider whether the use of a Bible in jury deliberations could create a bias of constitutional proportions. Its holdings have instead been limited to situ-

ations far different from that presented here. *See, e.g., Parker v. Gladden*, 385 U.S. 363, 363–64, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam) (improper influence where bailiff, inter alia, told juror that defendant was a "wicked fellow" who was guilty); *Turner*, 379 U.S. at 473–74, 85 S.Ct. 546 (improper influence where jury had "continuous and intimate association" with two key government witnesses); *Remmer*, 347 U.S. at 228–30, 74 S.Ct. 450 (improper influence from allegation that juror was bribed); *Mattox v. United States*, 146 U.S. 140, 150–51, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (improper influence where jurors read damaging newspaper article about defendant). It was therefore not unreasonable for the state court to conclude that these precedents did not control the constitutional considerations surrounding the presence of a Bible in the jury room during capital sentencing deliberations.

My distinguished brother in dissent purports to find a clearly established Supreme Court rule governing this situation. In this respect, he possesses more clairvoyance than either the state courts, the district court, or a substantial majority of this court. Whether the presence of a Bible is an external influence upon the jury or simply a part of the jury's internal processes is a question the Supreme Court has not even broached, much less settled. Whether biblical passages are common knowledge, *see Fields v. Brown*, 431 F.3d 1186, 1208–09 (9th Cir.2005), or whether they should be deemed to relate to the particular circumstances of a case, is likewise far from clear. To crystallize a constitutional rule from such uncertain circumstances is the very exercise that AEDPA forbids. In taking a very general principle involving "external influences" and extending it to difficult and problematic circumstances far removed from the context in which the principle has been

applied, my fine colleague erodes those constraints that AEDPA imposes on our review.

Both AEDPA and *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), express the sound proposition that state courts should not be penalized for judgments that are reasonable at the time but may (or may not) at some future point prove incorrect. It is the solemn duty of judges no less than jurors to respect the rule of law, of which the standard of review set by Congress is an integral component.

## V.

For the foregoing reasons, I concur in the denial of rehearing en banc.

KING, Circuit Judge, dissenting from the denial of rehearing en banc:

The Sixth Amendment right to an impartial jury has been long recognized as "fundamental to our system of justice." *Duncan v. Louisiana*, 391 U.S. 145, 153, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Described as "inherent and invaluable" by the First Congress of the American Colonies, and as a "great and inestimable privilege" by the First Continental Congress, the right to an impartial jury stands among those fundamental rights most revered by the founding generation. *Id.* at 152, 88 S.Ct. 1444; *see also The Declaration of Independence* para. 20 (listing among the grievances against George III that he "den[ied] us in many cases, of the benefit of Trial by Jury."). Given their distrust of governmental power, the veneration in which our forebears held the jury trial right is not surprising, for "[t]he primary purpose of the jury in our legal system is to stand between the accused and the powers of the State." *Lewis v. United States*, 518 U.S. 322, 335, 116 S.Ct. 2163, 135

L.Ed.2d 590 (1996) (Kennedy, J., concurring in the judgment). A trial jury, of course, can only serve this purpose if it is impartial. Thus, where a trial jury's deliberations have been contaminated by an improper external influence that threatens its impartiality, its tainted verdict must not be enforced. *See Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

According to Robinson's allegations, a trial juror, during sentencing-phase deliberations on whether he should be punished by execution, requested and received a Bible from the court bailiff without authorization by the court. The juror then read aloud to the deliberating jury a passage concerning the Biblical mandate of "an eye for an eye," in an effort to persuade fellow jurors to recommend the death sentence that Robinson ultimately received. The state court determined that these allegations failed to constitute an improper and unconstitutional external influence under the applicable Supreme Court precedents. As explained in my opinion dissenting from the panel majority's opinion, *see Robinson v. Polk*, 438 F.3d 350, 368–76 (4th Cir.2006) (King, J., dissenting in part), the state court's decision plainly "involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States," under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254(d)(1). I write again to supplement and emphasize the view I earlier expressed.

In a series of decisions, the Supreme Court has recognized and held that the contamination of a jury's deliberations by an improper external influence contravenes a defendant's right to an impartial jury. *See Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The external influences recognized by the Court in those decisions are factually diverse, but they share a single, constitutionally significant characteristic: they are external to the evidence and law in the case, and carry the potential to bias the jury against the defendant. This legal principle unifies the bailiff's remarks disparaging the defendant in *Parker*, the relationship of confidence between the jury and key prosecution witnesses in *Turner*, and the effort to bribe a juror in *Remmer*. And it plainly applies to the circumstances here.

The Supreme Court has struggled for decades to structure the law of capital sentencing so as to assure that a defendant facing a possible death sentence receives the individualized consideration that the Constitution mandates. Such individualized consideration is essential because the Constitution does not abide death as a punishment for all those convicted of murder; it reserves the ultimate penalty for "those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (internal quotation marks omitted). In order to minimize the risk that an individual defendant who falls outside of that "narrow category" may be sentenced to death, a deliberating jury must first find the existence of at least one precisely defined aggravating circumstance that applies only to a subclass of defendants convicted of murder. *See Tuilaepa v. California*, 512 U.S. 967, 971–72, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). If it finds the presence of such an aggravating circumstance, the jury must then make "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime," considering

all relevant mitigating evidence that the defendant has mustered in support of his plea for mercy. *See Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

If Robinson's allegations are true, one of his jurors, employing a Bible provided by the court's bailiff without court authorization, exhorted his fellow jurors to supplant the capital sentencing law prescribed by the Supreme Court with the divine command expressed in the Bible's mandate of "an eye for an eye." In effect, this juror requested that his fellow jurors throw the individualized consideration required by the Constitution to the wind, for while the Constitution requires that the death penalty be imposed through structured discretion on only a narrow class of the worst murderers, the principle of "an eye for an eye" licenses death as a punishment for any murder, a position rejected by the Supreme Court as contrary to the Constitution. *See Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). Simply put, the trial juror, by appealing to a text introduced into the jury room without court authorization, sought to persuade the jury to decide Robinson's fate by reference to a dictate that is contrary to what our Constitution mandates, and that derives from what many consider to be a divinely inspired source of law.

My good friend Judge Wilkinson has written—with characteristic eloquence—in support of the denial of en banc consider-

ation here, and he suggests that the state-court determination at issue was not unreasonable because the Supreme Court has not specifically considered "whether the use of a Bible in jury deliberations could create a bias of constitutional proportions." *Ante* at 229. The scope of our review for unreasonableness under AEDPA, however, is defined not simply by the factual similarity between the relevant Court precedents and the case on review, but by whether the legal principle embodied in those precedents reasonably must control in the factual context of the case on review. *See Williams (Terry) v. Taylor,* 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (observing that a state court decision involves an unreasonable application of Supreme Court precedent when it "unreasonably refuses to extend [a legal] principle to a new context where it should apply"). A legal principle, by definition, applies to diverse factual scenarios. And those factual scenarios can differ in innumerable ways, so long as they are analogous on the point to which the legal principle applies. *See Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (observing that "a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced" (internal quotation marks omitted)).*

In these circumstances, the governing legal principle—the prohibition against improper external influences on a jury's de-

---

* Indeed, to require strict factual parity under the "unreasonable application" clause of § 2254(d)(1) would conflate the "unreasonable application" clause with the "contrary to" clause. *See Williams,* 529 U.S. at 406, 120 S.Ct. 1495 (observing that state-court decision is contrary to Supreme Court precedent "if the state court confronts a set of facts that are materially indistinguishable from a

decision of th[e] Court and nevertheless arrives at a result different from [Supreme Court] precedent"). Such a requirement would read the "unreasonable application" clause out of § 2254 and would be inconsistent with the Court's admonition that the two clauses must be accorded "independent meaning." *Id.* at 405, 120 S.Ct. 1495.

liberations—applies to any set of facts that shares a common characteristic: an intrusion on the jury's deliberations that is external to the evidence and law in the case, and that carries the potential to bias the jury against the defendant. That single principle unites the divergent facts in *Parker*, *Turner*, and *Remmer*. And it was plainly unreasonable for the North Carolina state court to decline to apply it here, where a trial juror received an unauthorized text from the court bailiff and invoked from it what many consider to be divine commands, in order to convince his fellow jurors to apply a principle that is not only inconsistent with the law the jury was charged to apply, but that the Supreme Court has deemed unconstitutional.

If the Supreme Court principle prohibiting an external influence on a jury's deliberations does not apply in this case, it is difficult to imagine any state habeas corpus proceeding, absent one with facts identical to the pertinent Court cases, in which the principle would apply. While I entirely agree that our review under AEDPA must be deferential, to read and apply AEDPA's provisions so narrowly is essentially to abdicate our responsibility to utilize the Great Writ when a state court has unreasonably applied clearly established federal law as determined by the Supreme Court.

I dissent from the denial of rehearing en banc.

