# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 14, 2008

Charles R. Fulbruge III
Clerk

No. 06-70006

KHRISTIAN OLIVER

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before SMITH, GARZA, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

Khristian Oliver ("Oliver") seeks habeas corpus relief from his sentence of death for the murder of Joe Collins ("Collins"). Oliver argues that the jury violated his rights under the Sixth and Eighth Amendments by considering passages from the Bible during the sentencing phase of its deliberations. Although the jury improperly consulted the Bible, the state court found that the Bible did not influence the jury's decision. As Oliver has not presented clear and convincing evidence to rebut this factual finding, we AFFIRM the district court's decision to deny the writ.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Oliver shot Collins after Collins came home to find Oliver burglarizing his house.[1]  The jury learned that while Collins was lying on the ground after being shot, Oliver struck Collins several times in the head with a rifle butt.  At the trial, the medical expert testified that although Collins likely died from the gunshot wounds, the attack with the rifle butt also could have been fatal by itself.  A jury convicted Oliver of capital murder based on his killing of Collins during the commission of a burglary.  The jury sentenced him to death.  Oliver filed a motion for a new trial regarding his sentence, arguing that the jurors, during the penalty phase of their deliberations, improperly consulted the Bible.

At a state court evidentiary hearing on his motion for a new trial, Oliver called four jurors to testify.  Kenneth McHaney stated that during the jury's deliberations, one juror, Kenneth Grace, read the Bible aloud to a small group of jurors in the corner of the jury room.  McHaney also testified that fellow juror Donna Matheny mentioned to him that the Bible contained a passage discussing who is a murderer and who should be put to death, and that he asked Matheny if he could read her Bible, which Matheny had highlighted.[2]  McHaney recalled reading verses pertaining to the importance of obeying the law of the land, the commandment that "thou shalt not kill," and the passage Matheny pointed out that discussed who is a murderer and who deserves a death sentence.  In particular, he recalled reading a passage that says that if a man strikes someone with an iron object so that he dies, then he is a murderer and should be put to death.[3]  McHaney also witnessed juror Rhonda Robinson reading the same

---

[1] The district court recounted the facts of the murder in detail, and as we repeated those details in our prior opinion in this case, we need not do so again here.  See Oliver v. Quarterman, 254 F. App'x 381, 383 (5th Cir. 2007) (per curiam) (unpublished).

[2] Neither Grace nor Matheny testified at the hearing.

[3] The parties agree that the specific Bible passage at issue came from the Book of Numbers:

And if he smite him with an instrument of iron, so that he die, he is a murderer:

passage from the Bible.[4] McHaney believed that there were approximately four Bibles in the jury room, but he could not recall the exact number. He said that many jurors had Bibles with them because they went to church or Bible study at night.

Juror Maxine Symmank stated that she read the Bible to herself while in the jury room and that there was another male juror who read the Bible aloud to a small group of jurors at one end of the table. Symmank could not recall exactly when she read the Bible, although she believed it was after the jury made its punishment determination while the jurors waited for the court to reconvene. She admitted, however, that it is possible that she also read the Bible during earlier parts of the proceedings. Symmank recalled reading the same passage that McHaney had consulted from the Book of Numbers: "And if he smite him with an instrument of iron, so that he die, he is a murderer: the murderer shall surely be put to death." Symmank had decided to read this passage after a fellow juror opened the Bible to that page. Symmank confirmed, however, that no juror explicitly stated that the jury should use the Bible as evidence in its deliberations.

Rodney Rodrigues corroborated the testimony of the previous two jurors that at least one juror read Biblical passages aloud to a small group of jurors at

---

the murderer shall surely be put to death.

And if he smite him with throwing a stone, wherewith he may die, and he die, he is a murderer: the murderer shall surely be put to death.

Or if he smite him with an hand weapon of wood, wherewith he may die, and he die, he is a murderer: the murderer shall surely be put to death.

The revenger of blood himself shall slay the murderer: when he meeteth him, he shall slay him.

Numbers 35:16-19 (King James).

[4] Robinson also did not testify at the hearing.

some point during the deliberations. He testified that he did not read the Bible, but that some of his fellow jurors did. He did not know which passages the other jurors read. Finally, Glenda Webb recalled seeing more than one Bible in the jury room, but she stated that the Bible was not a focus of the jury's discussions. She recalled that some jurors consulted the Bible after they had made their decision on the appropriate punishment.

Based on this evidence, the state court ruled that the jury did not act improperly. The court concluded that "a conscientious, dedicated and carrying [sic] jury considered this case in accord with the Court's Charge and the instructions of the Court and rendered their verdict in accord with the evidence they heard in this case uninfluenced by any outside influence of any kind shown to the Court in this hearing." Oliver appealed this ruling to the Texas Court of Criminal Appeals ("TCCA"), which affirmed the trial court's decision to deny a new trial and stated that Oliver had not "met his burden of showing outside influence. While there was testimony that at least one Bible was brought to the jury room and some passages were read by a few jurors, every juror who testified stated that neither the Court nor another juror claimed that the Bible should be considered as law or evidence in the case." The state trial court and the TCCA denied Oliver's state habeas petition.

After exhausting his state court remedies, Oliver sought a writ of habeas corpus from the district court. He argued that the jury improperly consulted the Bible during its deliberations, particularly given that at least one passage the jurors read specifically described the facts of his case. Oliver also presented newly discovered evidence regarding the jury's actions. He alleged that juror Michael Brenneisen, who did not testify at the state court hearing, told foreign journalist Egon Clausen in an interview that the jurors discussed the Bible in depth before they rendered their decision during the punishment phase of the

trial.[5] Brenneisen told Clausen that he used the Bible during the punishment phase to ensure he was reaching the correct decision. Specifically, Brenneisen remembered asking himself, "is this the way the Lord would decide the case?" He also stated that the jury used the Bible "to lend support for or against the judgment call." He noted that the jury "went both directions in our use of the scripture—forgiveness and judgment." He acknowledged that the jury referred to specific passages in the Bible during its discussions, opening the Bible to various passages and reading them word-for-word. He also told Clausen that his personal belief is that if civil law and Biblical law conflict, then the Biblical law is paramount.[6]

The district court denied Oliver's habeas petition. The court viewed his argument as a request for an evidentiary hearing and ruled that Oliver is not entitled to an additional hearing under 28 U.S.C. § 2254(e)(2). The court also construed Oliver's claim to be a "pure question of fact" and denied habeas relief pursuant to the standard in § 2254(d)(2) that the state court's decision was not "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." The court, however, granted a certificate of appealability ("COA") on whether the jurors' use of the Bible violated Oliver's Sixth or Eighth Amendment rights.

On November 16, 2007, this court issued an opinion denying Oliver's request for a COA on three unrelated claims, denying his request for a stay and abatement for a state or federal hearing, and requesting that the parties file

---

[5] Oliver submitted to the district court a transcript of the interview between Clausen and Brenneisen. Clausen swore under oath in Denmark that the transcript was a true representation of his interview with Brenneisen.

[6] We present the information contained in Brenneisen's interview merely as background. As Oliver did not submit this evidence to the state court and therefore did not "develop the factual basis of [his] claim in State court proceedings," we do not consider the interview as substantive evidence in reaching our decision. See 28 U.S.C. § 2254(e)(2); Oliver, 254 F. App'x at 390.

additional briefs on his remaining claims.[7]  See Oliver v. Quarterman, 254 F. App'x 381 (5th Cir. 2007) (per curiam) (unpublished).  The only remaining question, therefore, involves the merits of Oliver's claim that the jury improperly consulted the Bible when deliberating during the sentencing phase of his trial.

## II.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court cannot grant habeas relief unless the state court adjudication of that claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d); see Wiggins v. Smith, 539 U.S. 510, 520 (2003).  Under § 2254(d)(1), a decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that precedent]." (Terry) Williams v. Taylor, 529 U.S. 362, 405 (2000).  A decision involves an unreasonable application of Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court precedent] to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. We must presume that the state court's factual findings are correct unless Oliver meets his burden of rebutting that presumption by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).

---

[7] In that opinion, we indicated that we might set this case for oral argument after the parties submitted their supplemental briefs.  However, we conclude that we can decide this case without oral argument.

## III. DISCUSSION

### A.    Supreme Court Precedent

Oliver rests his argument on Supreme Court precedent that, under the Sixth Amendment, forbids a jury from being exposed to external influences during its deliberations.[8]  See Parker v. Gladden, 385 U.S. 363, 364-65 (1966) (stating that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted));  Turner v. Louisiana, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury.");  Remmer v. United States, 347 U.S. 227, 229 (1954) (stating that "private communication, contact, or tampering" with the jury is presumptively prejudicial);  Mattox v. United States, 146 U.S. 140, 149 (1892) (stating that "in capital cases [] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberated and unbiased judgment").

Remmer provides our starting point for determining the Supreme Court's clearly established law regarding external influences on a jury.  See 347 U.S. at 229.  Remmer involved a third party who attempted to bribe a juror.  Id. at 228.  The juror notified the judge, who then informed the prosecutors.  Id.  The judge asked the FBI to investigate the incident, and the FBI concluded that the third party had made the statement to the juror in jest.  Id.  As a result, neither the judge nor the prosecutor told the defendant about the incident.  Id.  The jury found the defendant guilty, and he appealed after learning of the alleged bribery

---

[8] Oliver makes virtually the same argument under the Eighth Amendment.  However, as the applicable precedents invoke the Sixth Amendment, we constrain our analysis to that line of cases and reject his argument under the Eighth Amendment.

attempt. Id. The Supreme Court vacated the lower court's judgment that the defendant had not shown any prejudice and held that in a criminal case,

> any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Id. at 229. Remmer thus prohibits jurors from being subjected to "private communication, contact, or tampering" and considers any such external influences presumptively prejudicial. Id.; cf. United States v. Sylvester, 143 F.3d 923, 933 (5th Cir. 1998) (suggesting that "the presumption of prejudice and the assignment of the burden of proof are not triggered automatically but are imposed at the discretion of the district court").

Turner also involved an improper external influence on a jury. 379 U.S. at 467. There, two deputy sheriffs oversaw the sequestered jury. Id. As part of their duties, the deputies "ate with them, conversed with them, and did errands for them," although there was no evidence that the deputies spoke with the jurors about the case itself. Id. at 468. These same deputies also served as the prosecution's principal witnesses. Id. The Court held that the deputies' external contact with the jurors "subvert[ed] the[] basic guarantees of trial by jury." Id. at 473. In particular, the Court stated that "[t]he requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." Id. at 472 (internal quotation marks omitted).

In Parker, a court bailiff assigned to shepherd the sequestered jury stated to one of the jurors, while the jury was on a public sidewalk, "Oh that wicked

fellow [petitioner], he is guilty." 385 U.S. at 363. On another occasion, the bailiff remarked to at least one juror, "If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it." Id. at 364. The Supreme Court deemed the bailiff's statements to be "private talk, tending to reach the jury by outside influence." Id. (internal quotation marks omitted). In a later decision describing Parker, the Court characterized the bailiff's statements as involving an improper "external influence." See Tanner v. United States, 483 U.S. 107, 117 (1987).

Finally, the Court fleshed out the difference between an "external" and an "internal" influence on a jury in Tanner. Id. at 117. There, the Court considered allegations that a juror was intoxicated during the trial. Id. at 110. The Court held that the Sixth Amendment did not require the district court to hold an evidentiary hearing, because juror intoxication is not an "external influence." Id. at 127. In so holding, the Court noted that lower courts have distinguished between external influences, which a defendant can use to impeach a jury's verdict, and internal influences, which are not presumptively prejudicial. Id. at 117-18. A juror is exposed to an external influence when the juror reads information not admitted into evidence, such as a newspaper article about the case, or hears prejudicial statements from others, as in Parker and Remmer. Id. at 117. In contrast, internal influences, which provide no basis for relief, include allegations of physical or mental incompetence of a juror, such as claims that a juror was insane, could not sufficiently understand English, or had a severe hearing impairment. Id. at 119.

These cases demonstrate that the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence. Whether an influence is "external" or "internal" depends on the facts of each case, but at its core the distinction amounts to an examination of the "nature of the allegation" of an improper influence on the jury. Tanner, 483 U.S.

at 117; see Robinson v. Polk, 438 F.3d 350, 363 (4th Cir. 2006) ("Under clearly established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, or (2) is an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering with a juror.'") (internal citations omitted); Robinson, 438 F.3d at 373 (King, J., dissenting in part) ("If the 'nature' of the influence is that it impairs the juror's physical or mental ability to function effectively, it is an internal influence. Internal influences thus stand in stark contrast to their external counterparts, which come from without and carry the potential to bias the juror against the defendant."). Judge King, in his dissent from the denial of en banc rehearing in Robinson, cogently synthesized these Supreme Court cases:

> The external influences recognized by the Court in those decisions are factually diverse, but they share a single, constitutionally significant characteristic: they are external to the evidence and law in the case, and carry the potential to bias the jury against the defendant. This legal principle unifies the bailiff's remarks disparaging the defendant in Parker, the relationship of confidence between the jury and key prosecution witnesses in Turner, and the effort to bribe a juror in Remmer.

Robinson v. Polk, 444 F.3d 225, 231 (4th Cir. 2006) (King, J., dissenting). It is against this backdrop that we must consider whether the jurors' consultation of the Bible amounted to an external influence that raises a presumption of prejudice.

## B. The Bible as an External Influence on the Jury

Stemming from these clearly established Supreme Court precedents, it is clear that the prohibition of external influences from Remmer, Turner, and Parker applies to this factual scenario. See (Terry) Williams, 529 U.S. at 407 (stating that a decision involves an unreasonable application of Supreme Court

10

precedent if it "unreasonably refuses to extend [a legal principle from Supreme Court precedent] to a new context where it should apply"). Although there are no Fifth Circuit cases directly on point, language from the Eleventh, First, and Sixth Circuits bolsters this conclusion.

In McNair v. Campbell, 416 F.3d 1291, 1307-08 (11th Cir. 2005), the Eleventh Circuit analyzed a similar situation under the Remmer line of cases and determined that the jury's use of the Bible was presumptively prejudicial, but that the state had rebutted the presumption.[9] During the punishment phase of the trial, the foreman, a Christian minister, brought a Bible into the jury room during deliberations, read aloud from it, and led the other jurors in prayer. Id. at 1301. The court noted that "[b]ecause it is undisputed that jurors in the guilt phase of McNair's trial considered extrinsic evidence during their deliberations, our analysis focuses on whether the State can rebut the resulting presumption of prejudice." The court held that the state had rebutted the presumption of prejudice because there was no evidence that the "innocuous" Bible passages in question had the effect of influencing the jury's decision. Id.

Even before this decision, a district court within the Eleventh Circuit undertook a similar approach to this question. In Jones v. Kemp, 706 F. Supp. 1534, 1558 (N.D. Ga. 1989), a juror asked the court if he could take a Bible into the jury room, and the court said yes. The district court, on habeas review, stated that "[a] situation in which a jury, unsupervised by the court and unobserved by counsel, could reach a conclusion by consulting sources other than the legal charge of the court and evidence actually received by the court is not permitted." Id. at 1560. The court distinguished the situation of jurors bringing their own Bibles into the jury room to consult for personal inspiration or

---

[9] The court held that the district court should have dismissed this argument as procedurally barred, but the court still went on to consider the merits of the claim. McNair, 416 F.3d at 1307.

spiritual guidance. Id. "The sole issue here involves the at least implied court approval of a group jury reference to an extra-judicial authority—here the Christian Bible—for guidance in deciding the explicit, statutorily mandated, carefully worded guidelines which must be followed by a jury deliberating during the sentencing phase of a death penalty case." Id. The court did not analyze whether the state could rebut the presumption of prejudice.

The First Circuit also suggested that the presence of a Bible in the jury room amounts to an external influence on the jury's deliberations and that the Bible is no different from any other type of external influence that enters the jury's conscience. See United States v. Lara-Ramirez, 519 F.3d 76, 88 (1st Cir. 2008). That case does not directly align with the facts here, as it involved the direct review of a district court's mistrial declaration without the defendant's consent after the judge learned that the jury had consulted the Bible. Id. at 79. Nevertheless, the court's language is telling: the court stated that the district court erred in "treat[ing] the Bible in the jury room as qualitatively different from other types of extraneous materials or information that may taint a jury's deliberations." Id. at 88. The court held that "[b]ecause no special rule exists when the Bible is involved, the district court had a duty to investigate the colorable claim of juror taint in this case and explore and exhaust the alternatives to mistrial, just as it would in other situations where extraneous materials have been brought into the jury's deliberations." Id. at 89 (internal quotation marks omitted). Thus, underlying the court's analysis was the conclusion that the jurors' use of a Bible in the jury room constituted an "external influence."

The Sixth Circuit implied, albeit in dicta, that the presence of a Bible in the jury room is an external influence that might prejudice the jury's deliberations. See Coe v. Bell, 161 F.3d 320, 351 (6th Cir. 1998) (rejecting the petitioner's claim that the prosecutor's closing argument mentioning the Bible

amounted to reversible error). The court distinguished the situation of a prosecutor invoking the Bible during his closing argument from the cases where the jury actually had a Bible in the jury room. Id. The court concluded that "there is error in [the cases involving a Bible in the jury room] not because the book was the Bible, but because the book was not properly admitted evidence." Id.[10]

The Ninth Circuit, sitting en banc, refused to determine one way or the other whether the jury's reliance on the Bible constituted an external influence. Fields v. Brown, 503 F.3d 755, 781-82 (9th Cir. 2007) (en banc). In that case, a juror made notes "for" and "against" the death penalty based on his review of the Bible at home and then brought those notes into the jury room. Id. at 777-78. The court held, "[W]e do not need to decide whether there was juror misconduct because even assuming there was, we are persuaded that [the juror's notes] had

---

[10] In addition to the Eleventh, First, and Sixth Circuits, three state supreme courts have held that a Bible in the jury room is an external influence on the jury's deliberations. In People v. Harlan, 109 P.3d 616, 629 (Colo. 2005), the Colorado Supreme Court held that the jury's consultation of written Biblical materials in the jury room was improper under state law. In People v. Danks, 82 P.3d 1249, 1275 (Cal. 2004), the court found that a juror's action in bringing Bible passages into the jury room was "misconduct," but that the nature of the particular Bible verses the jurors had read made this misconduct not prejudicial. Finally, in State v. Harrington, 627 S.W.2d 345, 350 (Tenn. 1981), the Tennessee Supreme Court found a constitutional error when "the jury foreman buttressed his argument for imposition of the death penalty by reading to the jury selected Biblical passages." Because the court reversed and remanded for a new sentencing hearing on a different ground, however, the court did not undertake any analysis regarding prejudice. Id.

Moreover, in a case involving slightly different facts, the Pennsylvania Supreme Court vacated a death sentence when the prosecutor told the jury during closing arguments, "As the Bible says, 'and the murderer shall be put to death.'" Commonwealth v. Chambers, 599 A.2d 630, 644 (Pa. 1991). There, the prosecutor did not invoke well-known Biblical aphorisms reminding jurors to follow the law but instead sought to "interject[] religious law as an additional factor for the jury's consideration which neither flows from the evidence or any legitimate inference to be drawn therefrom." Id.; see also Romine v. Head, 253 F.3d 1349, 1368 (11th Cir. 2001) ("[A] prosecutor misleads a capital sentencing jury when he quotes scripture as higher authority for the proposition that death should be mandatory for anyone who murders his parents.").

no substantial and injurious effect or influence in determining the jury's verdict." Id. at 781.

The only circuit to hold that the Bible is not an external influence is the Fourth Circuit.[11] In Robinson v. Polk, 438 F.3d 350 (4th Cir. 2006), a juror asked the bailiff for a Bible and then read several passages out loud in the jury room—including at least one referring to "an eye for an eye"—to convince the other jurors to vote for a death sentence. Id. at 357-58. The court ruled that "reading the Bible is analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence." Id. at 364. "[P]recisely because the Bible occupies a unique place in the moral lives of those who believe in it, its teachings cannot blithely be lumped together with a private communication, contact, or tampering with a juror without clear guidance from the Supreme Court."[12] Id. at 366; see also Lenz v. Washington,

---

[11] The Second, Third, Seventh, Eighth, Tenth, and D.C. Circuits have not spoken on this issue.

[12] The Fourth Circuit declined to rehear the case en banc, although Judge Wilkinson stated that he believed there should be a "clear line" distinguishing between "personal and deliberative use of the Biblical text" in the jury room. Robinson v. Polk, 444 F.3d 225, 226 (4th Cir. 2006) (Wilkinson, J., concurring in the denial of rehearing en banc). Judge Wilkinson voted to deny rehearing, however, because he believed that AEDPA constrained the circuit court from fashioning such a rule. Id. at 229. We do not share Judge Wilkinson's concerns in this case because we are not creating a new rule. Remmer, Turner, and Parker clearly establish that it is presumptively prejudicial for a jury to consult an external influence, and bringing the Bible into the jury room and reading specific passages that bear directly upon the facts of the case is plainly outside the evidence and law. See, e.g., Fields v. Brown, 503 F.3d 755, 778-79 (9th Cir. 2007) (en banc) (stating that the prohibition from Teague v. Lane, 489 U.S. 288 (1989), of creating a "new rule" on habeas review does not preclude an argument that the Bible is an external influence). Further, we are not the first court to recognize the clearly established rule against external influences in the jury room and apply it to a set of facts that are distinct from those that the Supreme Court encountered. See, e.g., Wisehart v. Davis, 408 F.3d 321, 327 (7th Cir. 2005) (deeming a juror's knowledge from outside sources that the defendant had taken a polygraph test during the trial to be an external influence); Nevers v. Killinger, 169 F.3d 352, 369 (6th Cir. 1999) (stating, in a case involving white police officers who beat a black suspect, that the jury's viewing of the movie Malcolm X, its learning that the city was preparing for a potential riot in the event of an acquittal, and its knowledge that the defendants had been members of a controversial undercover police unit was extraneous evidence); United States v. Martinez, 14 F.3d 543, 551 (11th Cir. 1994) (examining the jury's

---

444 F.3d 295, 310-12 (4th Cir. 2006) (following Robinson); Billings v. Polk, 441 F.3d 238, 248 (4th Cir. 2006) (holding that a juror's reading of the Bible at home to assist his decision process did not raise a presumption of prejudice); Burch v. Corcoran, 273 F.3d 577, 591 (4th Cir. 2001) (stating that the jury's consultation of a Bible was not "improper jury communication" because the "Bible quotes, whether stated from memory or read from the book, were . . . statements of folk wisdom or of cultural precepts"). Judge King wrote a vigorous dissent in Robinson, which, given the Supreme Court's clear guidance regarding external influences and the analysis from the rest of the circuits, we find more persuasive than the majority's opinion. See Robinson, 438 F.3d at 368 (King, J., dissenting in part). Further, although we part company with the Fourth Circuit and join the majority of other courts to pass upon this issue, we note that the Fourth Circuit's cases are distinguishable in that they all involved a juror reading general Biblical statements, as opposed to a command that directly tracked the specific facts of those cases.

This analysis persuades us that when a juror brings a Bible into the deliberations and points out to her fellow jurors specific passages that describe the very facts at issue in the case, the juror has crossed an important line. The Supreme Court counsels us that a jury may not consult material that is outside the law and evidence in the case. The Bible passages in question here were not part of the law and evidence that the jury was to consider in its deliberations. Moreover, the jurors did not simply discuss their own understanding of religious law and morality or quote Bible passages from memory to aid the discussion. Instead, the jurors referenced a specific passage that stated that someone who engages in a particular act—striking a person with an object and killing him, as

---

use of a dictionary during deliberations under Remmer). But see United States v. Williams-Davis, 90 F.3d 490, 503 (D.C. Cir. 1996) (holding that a juror's use of a dictionary did not raise a presumption of prejudice).

Oliver did to Collins—is a murderer and must be put to death. Most circuits have ruled that when a Bible itself enters the jury room, the jury has been exposed to an external influence. Here, we face facts that are even more egregious than in those previous cases, as the jurors consulted a specific passage that provided guidance on the appropriate punishment for this particular method of murder. As such, we hold that the jury's consultation of the Bible passages in question during the sentencing phase of the trial amounted to an external influence on the jury's deliberations.

The question before us is not whether a juror must leave his or her moral values at the door or even whether a juror may consult the Bible for his or her own personal inspiration during the deliberation process. This case is also not about whether jurors must forget that, generally, the Bible includes the concept of an "eye for an eye." See Burch, 273 F.3d at 591 (noting that the "Bible quotes, whether stated from memory or read from the book, were . . . statements of folk wisdom or of cultural precepts"). Therefore, we need not address these issues. Instead, here, several jurors collectively consulted a Bible, in the jury room, and likely compared the facts of this case to the passage that teaches that capital punishment is appropriate for a person who strikes another over the head with an object and causes the person's death.

The state urges us to consider solely whether the Bible passage at issue had any bearing on the factual questions the jury had to decide during the sentencing phase: whether Oliver presented a threat of future dangerousness and whether there was mitigating evidence to warrant a sentence of life imprisonment instead of death. This argument misses the mark. The Bible served as an external influence precisely because it may have influenced the jurors simply to answer the questions in a manner that would ensure a sentence of death instead of conducting a thorough inquiry into these factual areas. Further, the Bible passage in this instance was evidence of the "circumstances

of the offense that militates for . . . the imposition of the death penalty." TEX. CODE CRIM. PROC. ANN. art. 37.071(d)(1) (discussing the instructions the court must give to the jury in a death penalty case).

A contrary holding would eviscerate the rule from Remmer that jurors must rely on only the evidence and law presented in an open court room. It may be true that the Bible informs jurors' general outlook of the world and their moral values in particular, and jurors may constitutionally rely upon those morals in their deliberations. See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 149 (1994) (O'Connor, J., concurring) ("Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them." (internal citation and quotation marks omitted)). But the particular passage at issue here does not generally inform a juror's moral understanding of the world. The jurors did not testify that they knew, as people of faith, that someone who hits another over the head with an "instrument of iron" or a "hand weapon of wood" so that the person dies is a murderer and should be put to death. Instead, several jurors testified that they read this passage in the Bible while they were in the jury room debating Oliver's fate. Thus, the jury's use of the Bible here amounts to a type of "private communication, contact, or tampering" that is outside the evidence and law, which is exactly what Remmer sought to circumscribe. 347 U.S. at 229.

## C.    Harmless Error Analysis

Our inquiry, however, is not complete. We must next determine the effect the Bible had on the jury's decision to impose the death penalty. That is, given that there was a constitutional error because the jury consulted an external influence, we must determine if that constitutional error was harmless. See Garcia v. Quarterman, 454 F.3d 441, 444 (5th Cir. 2006) ("If the issue is a mixed question of law and fact, such as the assessment of harmless error, we review the district court's determination de novo.").

Normally, under Remmer, if prejudice is likely from the jury's consultation of an external influence, the court may place the burden of rebutting that presumption on the state. See Remmer, 347 U.S. at 229; United States v. Sylvester, 143 F.3d 923, 934 (5th Cir. 1998) (stating that "only when the court determines that prejudice is likely should the government be required to prove its absence"); see also United States v. Olano, 507 U.S. 725, 739 (1993) (stating that the ultimate inquiry is whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict"). However, on habeas review, we do not use the normal harmless error analysis. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Pyles v. Johnson, 136 F.3d 986, 994 (5th Cir. 1998). Instead, habeas petitioners are not entitled to relief based on a constitutional error unless the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." Id. (citing Kotteakos v. United States, 328 U.S. 750, 776 (1946)); see also Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007) (holding that a federal court must assess the prejudicial impact of a constitutional error in a state court criminal trial under the "substantial and injurious effect" standard set forth in Brecht).[13]

Other courts to consider the effect of a Bible in the jury room have not faced similar facts, where the passage the jury read described the defendant's method of killing. For example, in McNair v. Campbell, the Eleventh Circuit noted that the two passages that the foreman had read to the jury did not contain "material which would encourage jurors to find a defendant guilty or to

---

[13] Not all circuits are in agreement regarding the appropriate standard for determining prejudice when a jury improperly consults the Bible during deliberations. In McNair v. Campbell, the Eleventh Circuit did not cite Brecht and instead analyzed whether the state could rebut the presumption of prejudice, holding that the state had carried its burden based on the "innocuous nature" of the Bible passages in question. 416 F.3d 1291, 1309 (11th Cir. 2005). However, we must follow our previous decision in Pyles, which stated that the Supreme Court requires us to use the Brecht standard when evaluating a habeas petitioner's claim that a juror improperly considered external evidence. See Pyles, 136 F.3d at 992.

recommend the death penalty."[14] 416 F.3d at 1308 (internal quotation marks omitted). Therefore, the Bible passages "merely had the effect of encouraging the jurors to take their obligations seriously and to decide the question of guilt or innocence based only on the evidence." Id. at 1309 (internal quotation marks omitted). In addition to the innocuous nature of the Bible passages at issue, the court noted that a juror brought in the extraneous evidence without the imprimatur of the court and that the state's case against the defendant was particularly strong. Id. These factors supported the court's view that the Bible passages did not prejudice the jury's decision. Id.[15]

Similarly, the Ninth Circuit, sitting en banc, rejected the petitioner's argument of prejudice when a juror made notes "for" and "against" the death penalty based on his review of the Bible at home and then brought those notes into the jury room. Fields v. Brown, 503 F.3d 755, 776-82 (9th Cir. 2007) (en banc). The court chose not to decide whether the juror's conduct was improper because, either way, the notes did not have a "substantial and injurious effect or influence in determining the jury's verdict."[16] Id. at 781. The court rested its decision of no prejudice on the fact that the juror's notes had both a "for" and "against" part, the notes entered the jury room early in the deliberations and thus jurors could still take as much time as they needed to sort through the evidence and reflect on the appropriate punishment, the jury was instructed to

---

[14] "The two Bible verses read included the familiar Psalm 121, and Luke 6:37. The latter verse reads as follows: 'Judge not, and ye shall not be judged; condemn not and ye shall not be condemned; forgive, and ye shall be forgiven . . . .'" McNair, 416 F.3d at 1308 n.16.

[15] The court also noted that the habeas petitioner had not rebutted the state court's factual finding that the Bible did not prejudice the jury's decision. Id. at 1308-09. Nevertheless, the court undertook its own review of the record and determined that the state had "carried its burden of rebutting the presumption of prejudice." Id. at 1309.

[16] Thus, the Ninth Circuit's approach was backwards under Remmer: the court found that any use of the Bible was not prejudicial before determining if the Bible was an external influence that would trigger the presumption of prejudice.

base its decision solely on the facts and the law as presented during the trial, and the aggravating evidence was powerful given that the case involved multiple murders, rape, and kidnapping. Id. at 781-82.[17]

While the facts before us regarding the jury's use of the Bible are perhaps more egregious than in these previous cases, the procedural posture here constrains our analysis. This is because here, the state court made a factual finding regarding the effect of the Bible on the jury, and we must defer to that factual finding unless Oliver presents "clear and convincing" evidence to the contrary. See 28 U.S.C. § 2254(e)(1). After hearing the testimony of four jurors at an evidentiary hearing on Oliver's motion for a new trial, the state court ruled that the jurors rendered their decision "in accord with the evidence they heard in this case uninfluenced by any outside influence of any kind shown to the Court in this hearing." In essence, the state court made a finding that the Bible did not prejudice the jury's decision. The effect of an ex parte communication on a juror's impartiality is a question of "historical fact." Rushen v. Spain, 464 U.S. 114, 120 (1983) (per curiam) (deferring to state court's finding of "historical fact" that the ex parte communications between a judge and a juror did not bias the jury's decision ); see also Patton v. Yount, 467 U.S. 1025, 1036-37 (1984) (holding that the question of juror impartiality is not a mixed question of law and fact but instead is "plainly one of historical fact"). A state court's post-trial factual finding regarding a juror's impartiality is entitled to a "presumption of correctness." Rushen, 464 U.S. at 120.

---

[17] Six judges dissented. As Judge Gould noted, "Considering that if only one juror had declined to sentence Fields to death the trial court would have been obligated to impose a life sentence, it is more probable than not that [the juror's] introduction of written researched Bible quotations into jury deliberations" prejudiced the jury. Id. at 788 (Gould, J., dissenting). Judge Berzon added that "[h]ere, there is no question that the Biblical passages copied by [the juror] pertained to the key legal question before the jury at the penalty phase—whether death was the appropriate sentence for Fields's acts." Id. at 793 (Berzon, J., dissenting).

For example, in Moody v. Johnson, the state court conducted two evidentiary hearings and determined that the improper conversation between the bailiff and one of the jurors did not impact the jury's deliberations. 139 F.3d 477, 483 (5th Cir. 1998). On habeas review, we noted that "[t]he determination of whether there was any improper conduct and its [e]ffect, if any, on juror impartiality are questions of historical fact that 'must be determined, in the first instance, by state courts and deferred to, in the absence of 'convincing evidence' to the contrary, by the federal courts.'" Id. (citing Rushen, 464 U.S. at 120); see, e.g., Schaff v. Snyder, 190 F.3d 513, 534-35 (7th Cir. 1999) (deferring to state court's post-trial factual finding that the extraneous statement the jury had heard regarding other similar charges against the defendant did not bias the jury's decision); Crease v. McKune, 189 F.3d 1188, 1193 (10th Cir. 1999) (deferring to state court's factual finding that improper communication between the judge and a juror did not prejudice the habeas petitioner). In contrast, if the state court does not make factual findings regarding the effect of an external influence on the jury, then we simply conduct a harmless error analysis using the Brecht standard without having to defer to any state court findings. See, e.g., Pyles, 136 F.3d at 994-95 (analyzing the prejudicial effect of a juror improperly visiting the crime scene without mentioning whether the state court made any factual findings). But see Dorsey v. Quarterman, 494 F.3d 527, 531 (5th Cir. 2007) (conducting a harmless error analysis without explicitly deferring to the state court's conclusion that the jury could continue deliberating even though two jurors had viewed evidence not in the record).

Oliver has failed to demonstrate that the state court's finding that the Bible did not influence the jury lacks "even fair support in the record." Rushen, 464 U.S. at 120 (internal quotation marks omitted). Although the record includes evidence that cuts both ways, given the highly deferential standard of habeas review, we conclude that at least four factors provide "fair support in the

record" for the state court's finding. See id.; see also Nelson v. Quarterman, 472 F.3d 287, 310 (5th Cir. 2006) (en banc) ("We are mindful that under AEDPA a federal court may not grant habeas relief simply because it disagrees with the state court's resolution of an issue . . . ."). First, there is contradictory evidence regarding whether the jurors' consultation of the Bible occurred before or after the jury reached its decision. Second, several jurors testified that the Bible was not a focus of their discussions. Third, the court instructed the jury that "[i]n deliberating upon the cause you are not to refer to or discuss any matter or issue not in evidence before you" and that "you are bound to receive the law from the Court."[18] Fourth, the jurors brought the Bibles into the jury room by themselves and without the imprimatur of the court. While Oliver makes several arguments that the Bible passages might have swayed the jury, he has not presented clear and convincing evidence to rebut the presumption of correctness that we must afford to the state court's factual finding, particularly given that the state court heard from the jurors themselves and concluded that the Bible did not prejudice their decision. See Rushen, 464 U.S. at 120 ("This finding of 'fact'—on a question the state courts were in a far better position than the federal courts to answer—deserves a high measure of deference . . . ." (internal quotation marks and citation omitted)); Young v. Herring, 938 F.2d 543, 559 n.8 (5th Cir. 1991) (noting that the trial judge is "uniquely qualified to appraise the prejudicial effect of a communication on the jury"). As Oliver has not presented clear and convincing evidence to rebut the state court's finding that the Bible did not influence the jury's decision, we cannot say that the jury's use of the Bible had

---

[18] We note that this factor also cuts against the state's argument in that the jurors disobeyed the court's instructions by consulting the Bible, which potentially tainted the jury's decision. See Fields, 503 F.3d at 787 (Gould, J., concurring in part and dissenting in part) (noting that "here the conclusion is inescapable that the jury did not follow the trial court's instructions" when it consulted the Bible). This fact also calls into question the court's statement that the jurors "considered this case in accord with the Court's Charge and the instructions of the Court . . . ."

a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

## IV. CONCLUSION

The jury's use of the Bible during the sentencing phase of Oliver's trial amounted to an improper external influence on the jury's deliberations. However, Oliver has failed to rebut the state court's factual finding that the Bible did not prejudice the jury's decision. Therefore, we AFFIRM the district court's judgment denying habeas relief.

AFFIRMED.